Laurence M. Rosen, Esq. (SBN 219683)
**THE ROSEN LAW FIRM, P.A.**
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| VICTOR BAO, derivatively on behalf of ALPHABET INC., <br><br> Plaintiff, <br><br> vs. <br><br> LAWRENCE E. PAGE, SUNDAR PICHAI, RUTH M. PORAT, SERGEY BRIN, ERIC E. SCHMIDT, L. JOHN DOERR, ROGER W. FERGUSON, JR., DIANE B. GREENE, JOHN L. HENNESSY, ANN MATHER, ALAN R. MULALLY, and K. RAM SCHRIRAM, <br><br> Defendants, <br><br> and <br><br> ALPHABET INC., <br><br> Nominal Defendant. | Case No.: <br><br> **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** <br><br><br><br> **DEMAND FOR JURY TRIAL** |

## INTRODUCTION

Plaintiff Victor Bao ("Plaintiff"), by his undersigned attorneys, derivatively and on behalf of Nominal Defendant Alphabet Inc. ("Alphabet" or the "Company"), files this Verified Shareholder Derivative Complaint against Individual Defendants Lawrence E. Page, Sundar Pichai, Ruth M. Porat, Sergey Brin, Eric E. Schmidt, L. John Doerr, Roger W. Ferguson, Jr., Diane B. Greene, John L. Hennessy,

Ann Mather, Alan R. Mulally, and K. Ram Schriram (collectively, the "Individual Defendants" and together with Alphabet, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Alphabet, unjust enrichment, waste of corporate assets, and violations of Sections 14(a), 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). As for his complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Alphabet, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## <u>NATURE OF THE ACTION</u>

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by Alphabet's directors and officers from at least 2015 through the present (the "Relevant Period").

2.      Alphabet, incorporated in 2015, is the parent company of Google, Inc. ("Google"), as well as a variety of other businesses that the Company reports collectively as "Other Bets."  Google is a nearly omnipresent technology company founded in 1998 whose name has become synonymous with online searches.

3.      One of the many services provided by Alphabet, through Google, is the Google+ social media platform. Google+ creates the appearance that users can restrict the sharing of personal information by toggling their privacy settings.

4.      However, between 2015 and March of 2018, a software issue, or "bug" in the Google+ platform enabled outside developers to access personal information of users who had opted out of publicly sharing their information (the "Data Breach").

5.      The bug was discovered in March 2018, as the Company itself admitted in October 2018. The Company attempted to determine the scope of the bug's impact, but was only able to determine how many users had been impacted in the two weeks prior to the bug's discovery—approximately 500,000 in total—due to the Company's data retention policy.

6.      An internal memorandum regarding the Data Breach was drafted and circulated to senior executives warning of the significant and immediate negative repercussions of disclosure. An internal committee determined not to disclose the breach. Defendant Sundar Pichai was briefed on this plan.

7.      On October 8, 2018, The Wall Street Journal revealed the Google+ data breach in an article titled "Google Exposed User Data, Feared Repercussions of Disclosing to Public." The article revealed, among other things, the Data Breach, and the Company's conscious and considered decision not to disclose it to the public.

8.      On this news, the price per share of Alphabet's Class A stock declined over two trading days from a close of $1,167.83 per share on October 5, 2018 to close at $1,145.17 per share on October 9, 2018 -- a drop of 1.9%, or $22.66. The price per share of Alphabet's Class C stock declined over two trading days from a close of $1,157.35 per share on October 5, 2018 to close at $1,138.82 per share on October 9, 2018 -- a drop of 1.6%, or $18.53.

9.      Days later, on October 10, 2018, Senator Richard Blumenthal announced that he would be requesting that the Federal Trade Commission ("FTC") investigate the Company as a result of the data breach. Senator Blumenthal, joined by two other senators, sent a letter to the FTC that day, enjoining the agency to conduct an investigation into the Google+ data breach.

10.     On this news, the price per share of Alphabet's Class A stock fell, closing at $1,092.16 per share on October 10, 2018 -- a drop of 4.6%, or $53.01 from its closing price on October 9, 2018. The price per share of Alphabet's Class C stock also fell, closing at $1,081.22 per share on October 10, 2018 -- a drop of 5%, or $57.60, from their closing price on October 9, 2018.

11.     On October 24, 2018, Senators Amy Klobuchar and Catherine Cortez Masto sent a letter to Defendant Pichai regarding the Company's failure to disclose the data breach for six months. The Senator's letter noted that the data breach raises "serious concerns" regarding the Company's compliance with consent decree the Company entered into with the with the FTC in 2011. That consent decree arose from the FTC's findings of privacy issues and deceptive tactics in connection with another social networking product, Google Buzz.

12.     On this news, the price per share of Alphabet's Class A stock fell, closing at $1,057.12 per share on October 24, 2018 -- a drop of 5.2%, or $57.79 from their closing price on October 23, 2018. The price per share of Alphabet's Class C stock also fell, closing at $1,050,71 per share on October 24, 2018 -- a drop of 5%, or $52.98 from their closing price on October 23, 2018.

13.     During the Relevant Period, the investing public was under a false impression of the Company's business, operations, and financial success.

14.     The Individual Defendants breached their fiduciary duties by knowingly or recklessly permitting and failing to prevent the Data Breach.

15.     Also during the Relevant Period, the Individual Defendants, in breach of their fiduciary duties owed to Alphabet, willfully or recklessly made and/or caused the Company to make false and misleading statements. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose that: (1) a software issue caused the Company to expose the private data of no less than 496,951 users of the Company's Google+ social network; (2) the Company, with the knowledge of at least one of the Individual Defendants,

concealed this data breach for months; (3) the foregoing constituted a violation of the Company's security and data privacy policies, and may have constituted a violation of one or more consent decrees; (4) upon the disclosure of the foregoing, the Company would be subject to reputational damage and increased regulatory scrutiny; (5) the Company's security systems were inadequate to protect user data; (6) the Company's management failed to set an appropriate "tone at the top"; (7) the Company failed to maintain internal controls; and (8) due to the foregoing, Defendants' statements regarding the Company's business, operations, and prospects were materially false, misleading, and lacked a reasonable basis in fact at all relevant times.

16.     The Individual Defendants failed to correct and/or caused the Company to fail to correct these false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

17.     Additionally, in breach of their fiduciary duties, the Individual Defendants willfully or recklessly caused the Company to fail to maintain internal controls.

18.     Furthermore, during the Relevant Period, the Individual Defendants breached their fiduciary duties by causing the Company to repurchase its own stock at prices that were artificially inflated due to the foregoing misrepresentations while four of them engaged in insider sales, netting proceeds of approximately $136 million. Approximately 3,750 shares of the Company's Class C capital stock were repurchased between April 1, 2018 and September 30, 2018 for approximately $4.3 million.[1] As the Company's stock was actually only worth $1,020.08 per share, the price at which it was trading when markets closed on October 29, 2018, the Company overpaid approximately $426,312 in total.

19.     The Individual Defendants' breaches of fiduciary duty and other misconduct have subjected the Company and its Chief Executive Officer ("CEO"), its Chief Financial Officer ("CFO"),

---

[1] Upon information and belief, some, if not all, of the 698 Class C shares repurchased in April 2018 were repurchased subsequent to the beginning of the Relevant Period on April 23, 2018.

and Company subsidiary Google's CEO to a federal securities fraud class action lawsuit pending in this District, and has subjected the Company and its CEO and CFO to a federal securities fraud class action lawsuit initially filed in the United States District Court for the Eastern District of New York and subsequently transferred to this District (the "Securities Class Actions"), the Company and its subsidiary Google to a class action alleging, *inter alia*, unlawful and unfair business practices and invasion of privacy in the United States District Court for the Northern District of California (the "California Class Action"), the need to undertake internal investigations, losses from the waste of corporate assets, and losses due to the unjust enrichment of Individual Defendants who were improperly over-compensated by the Company and who received proceeds of insider sales, and is costing the Company millions of dollars.

20.    The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

21.    In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action, and of their not being disinterested and/or independent directors, a majority of the Board cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

22.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n, Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a) and 78t-1), and SEC Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder, and raise a federal question pertaining to the claims made in the Securities Class Actions based on violations of the Exchange Act.

23.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

24.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

25.     Venue is proper in this District because Alphabet is headquartered in this District. In addition, a substantial portion of the transactions and wrongs complained of herein occurred in this District, the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

26.     Plaintiff is a current shareholder of Alphabet. Plaintiff has continuously held Alphabet common stock at all relevant times.

### Nominal Defendant Alphabet

27.     Alphabet is a Delaware corporation with its principal executive offices at 1600 Amphitheatre Parkway, Mountain View, California, 94043. Alphabet's Class A common shares trade on the NASDAQ under the ticker symbol "GOOGL." Alphabet's Class C capital stock shares trade on the NASDAQ under the ticker symbol "GOOG." Alphabet's Class B common stock, which entitles holders to ten votes per share, as compared to one vote for holders of Class A common stock, is not listed or traded on any exchange.

### Defendant Page

28.     Defendant Lawrence E. Page ("Page") was a founder of Google, has served on the Board since 1998, had has been Alphabet's CEO since 2015. Prior to becoming the CEO of Alphabet, Defendant Page served as the CEO of Google from 2011 to 2015. According to the Company's Schedule 14A filed with the SEC on April 28, 2018 (the "2018 Proxy Statement"), as of March 29, 2018, Defendant Page

1  beneficially owned 19,952,558 shares of the Company's Class B common stock, representing 25.9% of

2  total shareholder voting power as of that date.[2] Given that the price per share of the Company's Class A

3  common stock at the close of trading on March 29, 2018 was $1,037.14, Page owned at least $20.69

4  **billion** worth of Alphabet stock.[3]

5

6  29.     For the fiscal years ended December 31, 2016 and 2017, Defendant Page received $1 in

7  compensation from the Company, in the form of salary.

8  30.     The Company's 2018 Proxy Statement stated the following about Defendant Page:

9  *Larry Page,*[4] Chief Executive Officer of Alphabet, was one of Google's founders and has
   served as a member of our Board of Directors since its inception in September 1998, and
10  as Google's Chief Executive Officer from April 2011 to October 2015 (when he became
   the Chief Executive Officer of Alphabet). From July 2001 to April 2011, Larry served as
11  Google's President, Products. In addition, from September 1998 to July 2001, Larry served
   as Google's Chief Executive Officer, and from September 1998 to July 2002, as Google's
12  Chief Financial Officer. Larry holds a Master of Science degree in computer science from
   Stanford University and a Bachelor of Science degree in engineering, with a concentration
13  in computer engineering, from the University of Michigan.

14

15  31.     Upon information and belief, Defendant Page is a citizen of the State of California.

16  **Defendant Porat**

17  32.     Defendant Ruth M. Porat ("Porat") has served as Alphabet's and Google's Senior Vice

18  President and CFO since 2015. According to the 2018 Proxy Statement, as of March 29, 2018, Defendant

19  Porat beneficially owned 3,000 shares of the Company's Class A common stock. Given that the price per

20  share of the Company's Class A common stock at the close of trading on March 29, 2018 was $1,037.14,

21  Porat owned over $3.1 million worth of Alphabet stock.

22

23

24  [2] The 2018 Proxy Statement did not report on ownership of the Company's Class C capital stock, and the
   Individual Defendant's shareholdings listed herein are limited to their shares of Class A and Class B
25  common stock.

26  [3] As noted above, there is no developed market for Alphabet's Class B common stock, which holds
   superior voting rights to the Company's Class B common stock. Thus, the value of Class B common stock
27  is assumed to be at least equivalent in value to the Company's Class A common stock throughout this
   complaint.

28  [4] Emphasis is in the original unless otherwise noted throughout.

33.     For the fiscal year ended December 31, 2016, Defendant Porat received $39,074,129 in compensation from the Company. This included $650,000 in salary, $38,313,13 in stock awards, and $110,956 in all other compensation. For the fiscal year ended December 31, 2017, Defendant Porat received $688,638 in compensation from the Company. This included $650,000 in salary and $38,638 in all other compensation.

34.     The Company's 2018 Proxy Statement stated the following about Defendant Porat:

*Ruth M. Porat,* Senior Vice President and Chief Financial Officer of Alphabet since October 2015 and also Senior Vice President and Chief Financial Officer of Google since May 2015. Prior to joining Google, she served as Executive Vice President and Chief Financial Officer of Morgan Stanley since January 2010. She previously served as Vice Chairman of Investment Banking from September 2003 to December 2009 and as Global Head of the Financial Institutions Group from September 2006 through December 2009. Ruth is Vice Chair of the Stanford University board of trustees and a member of the board of directors of Stanford Management Company, a board member of The Council on Foreign Relations and a member of the Advisory Council of the Hutchins Center on Fiscal and Monetary Policy at the Brookings Institution. Ruth holds a Bachelor of Arts degree from Stanford University, a Master of Business Administration degree with distinction from The Wharton School of the University of Pennsylvania and a Master of Science from the London School of Economics.

35.     Upon information and belief, Defendant Porat is a citizen of the State of California.

**Defendant Pichai**

36.     Defendant Sundar Pichai ("Pichai") has served as Google's CEO since 2015 and as a member of Alphabet's Board since 2017.  According to the 2018 Proxy Statement, as of March 29, 2018, Defendant Pichai beneficially owned 16,332 shares of the Company's Class A common stock.[5] Given that the price per share of the Company's Class A common stock at the close of trading on March 29, 2018 was $1,037.14, Pichai owned over $16.9 million worth of Alphabet stock.

---

[5] This figure includes 12,541 shares of Class A common stock issuable upon exercise of options that are fully vested and exercisable and 2,526 shares of Class A common stock issuable upon vesting of Google Stock Units ("GSUs") within sixty days of March 29, 2018. GSUs entitle the beneficial owner to receive one share of Class A common stock for each share underlying the GSU as the GSU vests.

37.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Pichai made the following sales of Company stock, and made no purchases of Company stock:

| Date | Security | Number of Shares | Price[6] | Proceeds |
|---|---|---|---|---|
| May 2, 2018 | Class A | 325 | $          1,037.05 | $      337,041 |
| May 2, 2018 | Class C | 3,675 | $          1,028.10 | $   3,778,268 |
| May 16, 2018 | Class A | 325 | $          1,085.09 | $      352,654 |
| May 16, 2018 | Class C | 3,675 | $          1,077.31 | $   3,959,114 |
| June 6, 2018 | Class A | 325 | $          1,152.77 | $      374,650 |
| June 6, 2018 | Class C | 8,775 | $ 1,136.78-1,142.54 | $   9,993,719 |
| June 20, 2018 | Class A | 325 | $          1,183.04 | $      384,488 |
| June 20, 2018 | Class C | 9,675 | $ 1,176.05-1,183.06 | $ 11,406,255 |
| July 5, 2018 | Class A | 325 | $          1,124.60 | $      365,495 |
| July 5, 2018 | Class C | 9,675 | $ 1,112.15-1,116.84 | $ 10,768,661 |
| July 18, 2018 | Class A | 325 | $          1,208.73 | $      392,837 |
| July 18, 2018 | Class C | 9,675 | $1,194.61-1,204.45 | $ 11,591,830 |
| August 1, 2018 | Class A | 325 | $          1,242.73 | $      403,887 |
| August 1, 2018 | Class C | 9,675 | $ 1,226.20-1.233.89 | $ 11,886,837 |
| August 15, 2018 | Class A | 325 | $          1,245.30 | $      404,723 |
| August 15, 2018 | Class C | 9,675 | $ 1,226.42-1,235.38 | $ 11,897,420 |
| September 5, 2018 | Class A | 325 | $          1,208.60 | $      392,795 |
| September 5, 2018 | Class C | 9,675 | $ 1,187.66-1,195.79 | $ 11,528,373 |
| September 19, 2018 | Class A | 325 | $          1,168.96 | $      379,912 |
| September 19, 2018 | Class C | 9,675 | $ 1,156.45-1,166.70 | $ 11,224,259 |
| October 3, 2018 | Class A | 325 | $          1,212.00 | $      393,900 |
| October 3, 2018 | Class C | 9,675 | $ 1,198.21- 1,206.55 | $   8,198,535 |

Thus, in total, before the fraud was exposed, he sold 97,100 Company shares on inside information, for which he received approximately $110.4 million. His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

---

[6] Price ranges in this column represent the total range of prices at which Defendant Pichai sold Class C capital stock on the date in question. Proceeds have been calculated using the average prices listed in the relevant Form 4's filed with the SEC.

38.     For the fiscal year ended December 31, 2016, Defendant Pichai received $199,718,200 in compensation from the Company. This included $650,000 in salary, $198,695,780 in stock awards, and $372,410 in all other compensation. For the fiscal year ended December 31, 2017, Defendant Pichai received $1,333,557 in compensation from the Company. This included $650,000 in salary, and $683,557 in all other compensation.

39.     The Company's 2018 Proxy Statement stated the following about Defendant Pichai:

> *Sundar Pichai,* Chief Executive Officer of Google since October 2015, has served as a member of our Board of Directors since July 2017. Sundar previously served as Google's Senior Vice President of Products from October 2014 to October 2015, and as Google's Senior Vice President of Android, Chrome and Apps from March 2013 to October 2014. Since joining Google in April 2004, Sundar has held various positions, including Google's Senior Vice President, Chrome and Apps; Senior Vice President, Chrome; and Vice President, Product Management. Prior to joining Google, Sundar worked in engineering and product management at Applied Materials, Inc., a semiconductor company, and in management consulting at McKinsey & Company, a management consulting firm. Sundar was previously a director of Jive Software, Inc., a provider of communication and collaboration solutions, from April 2011 to July 2013. Sundar holds a Master of Science degree in materials, science and engineering from Stanford University, a Master of Business Administration degree from The Wharton School of the University of Pennsylvania, and a Bachelor of Engineering degree with honors in metallurgical engineering from the Indian Institute of Technology Kharagpur.

40.     Upon information and belief, Defendant Pichai is a citizen of the State of California.

**Defendant Brin**

41.     Defendant Sergey Brin ("Brin") is one of the founders of Google, the President of Alphabet, and has served as a member of the Board since 1998. According to the 2018 Proxy Statement, as of March 29, 2018, Defendant Brin beneficially owned 19,290,366 shares of the Company's Class B common stock, representing 25.1% of total shareholder voting power as of that date. Given that the price per share of the Company's Class A common stock at the close of trading on March 29, 2018 was $1,037.14, Brin owned at least $20 ***billion*** worth of Alphabet stock.

42.     For the fiscal years ended December 31, 2016 and 2017, Defendant Brin received $1 in compensation from the Company in the form of salary.

43.     The Company's 2018 Proxy Statement stated the following about Defendant Brin:

*Sergey Brin,* President of Alphabet, was one of Google's founders and has served as a member of our Board of Directors since its inception in September 1998. Previously, Sergey served as Google's President, Technology and Co-Founder. In addition, from September 1998 to July 2001, Sergey served as Google's President and Chairman of Google's Board of Directors. Sergey holds a Master of Science degree in computer science from Stanford University and a Bachelor of Science degree with high honors in mathematics and computer science from the University of Maryland at College Park.

44.     Upon information and belief, Defendant Brin is a citizen of the State of California.

**Defendant Schmidt**

45.     Defendant Eric E. Schmidt ("Schmidt") has  served as a member of  the Company's Board since 2001, and currently serves as a technical advisor to the Company. Defendant Schmidt previously served as Google's CEO from 2001 to 2011 and as the Company's Executive Chair from 2011 to January 2018. According to the 2018 Proxy Statement, as of March 29, 2018, Defendant Schmidt beneficially owned 219,960 shares of the Company's Class A common stock and 4,283,434 shares of the Company's Class B common stock, representing 5.6% of total shareholder voting power as of that date.[7] Given that the price per share of the Company's Class A common stock at the close of trading on March 29, 2018 was $1,037.14, Schmidt owned at least $4.67 ***billion*** worth of Alphabet stock.

46.     For the fiscal year ended December 31, 2016, Defendant Schmidt received $4,309,791 in compensation from the Company. This included $1,250,000 in salary, $2,430,685 in non-qualified deferred compensation earnings, and $629,106 in all other compensation. For the fiscal year ended December 31, 2017, Defendant Schmidt received $4,726,592 in compensation from the Company. This

---

[7] This figure includes 181,840 shares of Class A common stock issuable upon exercise of options that are fully vested and exercisable; 5,491 shares of Class A common stock issuable upon vesting of GSUs within sixty days of March 29, 2018; 702,326 shares of Class B common stock held by the Schmidt Investments L.P. of which the Schmidt Family Living Trust is the sole general partner; and 2,386,799 shares of Class B common stock held by the Schmidt Family Living Trust of which Defendant Schmidt is a co-trustee.

included $1,250,000 in salary, $2,798,606 in non-qualified deferred compensation earnings, and $677,986 in all other compensation.

47.     The Company's 2018 Proxy Statement stated the following about Defendant Schmidt:

*Eric E. Schmidt,* Technical Advisor of Alphabet, has served as a member of our Board of Directors since March 2001, and as Executive Chairman of our Board of Directors from April 2011 to January 2018. From July 2001 to April 2011, Eric served as Google's Chief Executive Officer. He was the chairman of Google's board of directors from March 2001 to April 2004, and again from April 2007 to April 2011. Prior to joining Google, from April 1997 to November 2001, Eric served as chairman of the board of directors of Novell, Inc., a computer networking company, and, from April 1997 to July 2001, as the Chief Executive Officer of Novell. From 1983 until March 1997, Eric held various positions at Sun Microsystems, Inc., a supplier of network computing solutions, including Chief Technology Officer from February 1994 to March 1997, and President of Sun Technology Enterprises from February 1991 until February 1994. Eric is a visiting innovation fellow at the Massachusetts Institute of Technology. Eric holds a Doctoral degree and a Master of Science degree in computer science from the University of California, Berkeley, and a Bachelor of Science degree in electrical engineering from Princeton University.

48.     Upon information and belief, Defendant Schmidt is a citizen of the State of California.

**Defendant Doerr**

49.     Defendant L. John Doerr ("Doerr") has served as a Company director since 1999. According to the 2018 Proxy Statement, as of March 29, 2018, Defendant Doerr beneficially owned 145,594 shares of the Company's Class A common stock and 1,117,447 shares of the Company' Class B common stock, representing 1.5% of total shareholder voting power as of that date. Given that the price per share of the Company's Class A common stock at the close of trading on March 29, 2018 was $1,037.14, Doerr owned over approximately $1.31 ***billion*** worth of Alphabet stock.

50.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Doerr made the following sales of the Company's Class C capital stock, and made no purchases of Company stock:

| Date | Number of Shares | Price[8] | Proceeds |
|---|---|---|---|
| May 15, 2018 | 11,097 | $ 1,075.42-1,090.30 | $    11,999,485 |
| August 15, 2018 | 10,262 | $ 1,212.47-1,231.34 | $    12,519,386 |

Thus, in total, before the fraud was exposed, he sold 21,359 shares of the Company's Class C capital stock on inside information, for which he received approximately $24.5 million. His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

51.    For the fiscal year ended December 31, 2017, Defendant Doerr received $430,567 in compensation from the Company, comprised of $75,000 in fees earned or paid in cash and $355,567 in stock awards.

52.    The Company's 2018 Proxy Statement stated the following about Defendant Doerr:

*L. John Doerr* has served as a member of our Board of Directors since May 1999. John has been a General Partner of Kleiner Perkins Caufield & Byers, a venture capital firm, since August 1980. John has also been a member of the board of directors of Amyris, Inc., a renewable products company, since May 2006, and serves as chair of its nominating and governance committee and as a member of its leadership development and compensation committee. John was previously a director of Zynga, Inc., a provider of social game services, from April 2013 to May 2017. John holds a Master of Business Administration degree from Harvard Business School, and a Master of Science degree in electrical engineering and computer science, and a Bachelor of Science degree in electrical engineering from Rice University.

53.    Upon information and belief, Defendant Doerr is a citizen of the State of California.

**Defendant Ferguson**

54.    Defendant Roger W. Ferguson, Jr. ("Ferguson") has served as a Company director since 2016, and is a member of the Audit Committee.

---

[8] Price ranges in this column represent the total range of prices at which Defendant Doerr sold Class C capital stock on the date in question. Proceeds have been calculated using the average prices listed in the relevant Form 4's filed with the SEC.

55. For the fiscal year ended December 31, 2017, Defendant Ferguson received $410,708 in compensation from the Company, comprised of $71,552 in fees earned or paid in cash and $339,156 in stock awards.

56. The Company's 2018 Proxy Statement stated the following about Defendant Ferguson:

*Roger W. Ferguson, Jr.* has served as a member of our Board of Directors since June 2016. Roger has served as the President and Chief Executive Officer of TIAA, a major financial services company, since April 2008. He joined TIAA after his tenure at Swiss Re, a global reinsurance company, where he served as Chairman of the firm's America Holding Corporation, Head of Financial Services, and a member of the Executive Committee from 2006 to 2008. Prior to that, Roger joined the Board of Governors of the U.S. Federal Reserve System in 1997 and served as its Vice Chairman from 1999 to 2006, and was a consultant at McKinsey & Company from 1984 to 1997. Roger has been a member of the board of directors of General Mills, Inc., a manufacturer and marketer of branded consumer foods, since December 2015, and serves as chair of its finance committee, and as a member of its corporate governance committee; and a member of the board of directors of International Flavors & Fragrances, Inc., a creator of flavors and fragrances, since April 2010, and serves as chair of its compensation committee. He is currently Chairman of the Conference Board and serves on the board of trustees of the Institute for Advanced Study, The Group of Thirty, and the Memorial Sloan Kettering Cancer Center. Roger holds a Bachelor of Arts degree in economics, a Doctoral degree in economics, and a Juris Doctor degree, all from Harvard University.

**Defendant Greene**

57. Defendant Diane B. Greene ("Greene") has served as a Company director since 2012, and as Senior Vice President and CEO of Google Cloud since 2015. According to the 2018 Proxy Statement, as of March 29, 2018, Defendant Greene beneficially owned 185 shares of the Company's Class A common stock.[9] Given that the price per share of the Company's Class A common stock at the close of trading on March 29, 2018 was $1,037.14, Greene owned approximately $191,870 worth of Alphabet stock.

---

[9] This figure includes 123 shares of Class A common stock held by the Greene/Rosenblum Family 2004 Trust; 11 shares of Class A common stock held by the Nathan Greene Rosenblum Irrevocable Trust; and 11 shares of Class A common stock held by the Mara Rosenblum Greene Irrevocable Trust. Defendant Greene is a trustee of each of these trusts and has voting and investment authority over the shares held by these trusts.

58.     For the fiscal year ended December 31, 2017, Defendant Greene received $674,177 in compensation from the Company, comprised of $650,000 in salary, $15,048 in life insurance premiums, and $9,129 in other benefits and perquisites.

59.     The Company's 2018 Proxy Statement stated the following about Defendant Greene:

*Diane B. Greene* has served as a member of our Board of Directors since January 2012 and as a Senior Vice President, Chief Executive Officer, Google Cloud, since December 2015. Diane founded bebop Technologies, Inc. (bebop) and served as Chief Executive Officer and a member of its board of directors from December 2012 to December 2015 when bebop was acquired by Google. Diane was previously a director of Intuit Inc., a provider of business and financial management solutions, from August 2006 to January 2018. Diane co-founded VMware, Inc., a virtualization software company, in 1998 and took the company public in 2007. She served as Chief Executive Officer and President of VMware from 1998 to 2008, as a member of the board of directors of VMware from 2007 to 2008, and as an Executive Vice President of EMC Corporation, a provider of information infrastructure and virtual infrastructure technologies, solutions and services, from 2005 to 2008. Prior to VMware, Diane held technical leadership positions at Silicon Graphics Inc., a provider of technical computing, storage and data center solutions, Tandem Computers, Inc., a manufacturer of computer systems, and Sybase Inc., an enterprise software and services company, and was Chief Executive Officer of VXtreme, Inc., a developer of streaming media solutions. Diane is also a lifetime member of The MIT Corporation, the governing body of the Massachusetts Institute of Technology. Diane holds a Master of Science degree in computer science from the University of California, Berkeley, a Master of Science degree in naval architecture from the Massachusetts Institute of Technology, and a Bachelor of Arts degree in mechanical engineering from the University of Vermont.

60.     Upon information and belief, Defendant Greene is a citizen of the State of California.

**Defendant Hennessy**

61.     Defendant John L. Hennessy ("Hennessy") has served as a Company director since 2004, and as the Company's Chairman since January 2018. According to the 2018 Proxy Statement, as of March 29, 2018, Defendant Hennessy beneficially owned 4,843 shares of the Company's Class A common stock.[10] Given that the price per share of the Company's Class A common stock at the close of trading on March 29, 2018 was $1,037.14, Hennessy owned approximately $5 million worth of Alphabet stock.

---

[10] This figure includes 4,760 shares of Class A common stock held by the Hennessy 1993 Revocable Trust. Defendant Hennessy is a trustee of the Hennessy 1993 Revocable Trust and has voting and investment authority over the shares held by the Trust.

62.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Hennessy made the following sales of Company stock, and made no purchases of Company stock:

| Date | Security | Number of Shares | Price | Proceeds |
|------|----------|------------------|-------|----------|
| July 25, 2018 | Class A | 400 | $ 1,257.92 | $       503,168 |
| July 25, 2018 | Class C | 324 | $ 1,240.89 | $       402,048 |

Thus, in total, before the fraud was exposed, he sold 724 Company shares on inside information, for which he received approximately $905,216. His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

63.     For the fiscal year ended December 31, 2017, Defendant Hennessy received $430,567 in compensation from the Company, comprised of $75,000 in fees earned or paid in cash and $355,567 in stock awards.

64.     The Company's 2018 Proxy Statement stated the following about Defendant Hennessy:

*John L. Hennessy* has served as a member of our Board of Directors since April 2004 and as Chairman of the Board of Directors since January 2018. John previously served as our Lead Independent Director from April 2007 to January 2018. John served as the President of Stanford University from September 2000 to August 2016. John has also been a member of the board of directors of Cisco Systems, Inc., a networking equipment company, since January 2002, and serves on its nominating and governance committee and acquisition committee. He also serves as a trustee of the Gordon and Betty Moore Foundation and as a director of the Chan Zuckerberg Biohub. From 1994 to August 2000, John held various positions at Stanford, including Dean of the Stanford University School of Engineering and Chair of the Stanford University Department of Computer Science. John holds a Doctoral degree and a Master of Science degree in computer science from the State University of New York, Stony Brook, and a Bachelor of Science degree in electrical engineering from Villanova University.

65.     Upon information and belief, Defendant Hennessy is a citizen of the State of California.

**Defendant Mather**

66.     Defendant Ann Mather ("Mather") has served as a Company director since 2005, and is the Chair of the Audit Committee. According to the 2018 Proxy Statement, as of March 29, 2018,

Defendant Mather beneficially owned 1,680 shares of the Company's Class A common stock. Given that the price per share of the Company's Class A common stock at the close of trading on March 29, 2018 was $1,037.14, Mather owned over $1.7 million worth of Alphabet stock.

67.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Mather made the following sales of the Company's Class C capital stock, and made no purchases of Company stock:

| Date | Number of Shares | Price | Proceeds |
|---|---|---|---|
| May 2, 2018 | 37 | $ 1,028.10 | $        38,040 |
| June 1, 2018 | 39 | $ 1,099.06 | $        42,863 |
| July 2, 2018 | 24 | $ 1,100.00 | $        26,400 |
| August 1, 2018 | 25 | $ 1,228.64 | $        30,716 |
| September 4, 2018 | 24 | $ 1,206.20 | $        28,949 |
| October 1, 2018 | 25 | $ 1,199.89 | $        29,997 |

Thus, in total, before the fraud was exposed, she sold 174 shares of the Company's Class C capital stock on inside information, for which she received approximately $196,965. Her insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate her motive in facilitating and participating in the scheme.

68.     For the fiscal year ended December 31, 2017, Defendant Mather received $455,567 in compensation from the Company, comprised of $100,000 in fees earned or paid in cash and $355,567 in stock awards.

69.     The Company's 2018 Proxy Statement stated the following about Defendant Mather:

*Ann Mather* has served as a member of our Board of Directors since November 2005. Ann has also been a member of the board of directors of: Arista Networks, Inc., a computer networking company, since June 2013, and serves as chair of its audit committee; Glu Mobile Inc., a publisher of mobile games, since September 2005, and serves on its nominating and corporate governance committee; Netflix, Inc., a streaming media company, since July 2010, and serves as chair of its audit committee; and Shutterfly, Inc., an internet-based image publishing company, since May 2013 and serves on its audit committee. Ann has also been an independent trustee to the Dodge & Cox Funds board of trustees since May 2011. Ann was previously a director of Solazyme, Inc., a biotechnology

company, from April 2011 to November 2014. From 1999 to 2004, Ann was Executive Vice President and Chief Financial Officer of Pixar, a computer animation film studio. Prior to her service at Pixar, Ann was Executive Vice President and Chief Financial Officer of Village Roadshow Pictures, the film production division of Village Roadshow Limited. Ann holds a Master of Arts degree from Cambridge University in England, is an honorary fellow of Sidney Sussex College, Cambridge, and is a chartered accountant.

70.     Upon information and belief, Defendant Mather is a citizen of the State of California.

**Defendant Mulally**

71.     Defendant Alan R. Mulally ("Mulally") has served as a Company director since 2006, and is a member of the Audit Committee.

72.     For the fiscal year ended December 31, 2017, Defendant Mulally received $430,567 in compensation from the Company, comprised of $75,000 in fees earned or paid in cash, and $355,567 in stock awards.

73.     The Company's 2018 Proxy Statement stated the following about Defendant Mulally:

*Alan R. Mulally* has served as a member of our Board of Directors since July 2014. Alan served as President and Chief Executive Officer of Ford Motor Company, a global automotive company, from September 2006 through June 2014. Alan was previously a member of the board of directors of Ford and served on its finance committee from September 2006 through June 2014. From March 2001 to September 2006, Alan served as Executive Vice President of the Boeing Company and President and Chief Executive Officer of Boeing Commercial Airplanes, Inc. He also was a member of the Boeing Executive Council. Prior to that time, he served as President of Boeing's space and defense business. Alan served as co-chair of the Washington Competitiveness Council and sat on the advisory boards of NASA, the University of Washington, the University of Kansas, the Massachusetts Institute of Technology, and the U.S. Air Force Scientific Advisory Board. He is a member of the U.S. National Academy of Engineering and a fellow of England's Royal Academy of Engineering. Alan holds a Bachelor of Science and Master of Science degrees in aeronautical and astronautical engineering from the University of Kansas, and a Master's degree in Management from the Massachusetts Institute of Technology as a 1982 Alfred P. Sloan fellow.

**Defendant Shriram**

74.     Defendant K. Ram Shriram ("Shriram") has served as a Company director since 1998. According to the 2018 Proxy Statement, as of March 29, 2018, Defendant Shriram beneficially owned

144,037 shares of the Company's Class A common stock.[11] Given that the price per share of the Company's Class A common stock at the close of trading on March 29, 2018 was $1,037.14, Shriram owned approximately $149.4 million worth of Alphabet stock.

75.    For the fiscal year ended December 31, 2017, Defendant Shriram received $430,567 in compensation from the Company, comprised of $75,000 in fees earned or paid in cash, and $355,567 in stock awards.

76.    The Company's 2018 Proxy Statement stated the following about Defendant Shriram:

*K. Ram Shriram* has served as a member of our Board of Directors since September 1998. Ram has been a managing partner of Sherpalo Ventures, LLC, an angel venture investment company, since January 2000. From August 1998 to September 1999, Ram served as Vice President of Business Development at Amazon.com, Inc., an ecommerce company. Prior to that, Ram served as President at Junglee Corporation, a provider of database technology, which was acquired by Amazon.com in 1998. Ram was an early member of the executive team at Netscape Communications Corporation. Ram is also on the Stanford University board of trustees. Ram holds a Bachelor of Science degree in mathematics from the University of Madras, India.

77.    Upon information and belief, Defendant Shriram is a citizen of the State of California.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

78.    By reason of their positions as officers, directors, and/or fiduciaries of Alphabet and because of their ability to control the business and corporate affairs of Alphabet, the Individual Defendants owed Alphabet and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Alphabet in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Alphabet and its shareholders so as to benefit all shareholders equally.

---

[11] This figure includes 63,041 shares of Class A common stock held by Defendant Shriram's spouse; and 16,884 shares of Class A common stock held by Janket Ventures Limited Partnership. Defendant Shriram has voting and investment authority over the shares held by Janket Ventures Limited Partnership.

79.     Each director, officer, and controller of the Company owes to Alphabet and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

80.     The Individual Defendants, because of their positions of control and authority as directors, officers, and/or controllers of Alphabet, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

81.     To discharge their duties, the officers, directors, and controllers of Alphabet were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

82.     Each Individual Defendant, by virtue of his, her, or its position as a director, officer, and/or controlling shareholder owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors, officers, and controllers of Alphabet, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers, directors, and/or controllers of the Company has been ratified by the remaining Individual Defendants who collectively comprised Alphabet's Board at all relevant times.

83.     As senior executive officers, directors, and controllers of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth,

operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Additionally, the Individual Defendants had a duty not to cause the Company to waste corporate assets by making the Company repurchase its own stock at artificially inflated prices, to the detriment of the Company and its shareholders.

84.     To discharge their duties, the officers and directors of Alphabet were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Alphabet were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, California, and the United States, and pursuant to Alphabet's own Code of Conduct;

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how Alphabet conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of Alphabet and procedures for the reporting of the business and internal affairs to the

Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)   maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Alphabet's operations would comply with all applicable laws and Alphabet's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)   exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)   refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)   examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

85.   Each of the Individual Defendants further owed to Alphabet and the shareholders the duty of loyalty requiring that each favor Alphabet's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

86.   At all times relevant hereto, the Individual Defendants were the agents of each other and of Alphabet and were at all times acting within the course and scope of such agency.

87.   Because of their advisory, executive, managerial, directorial, and controlling positions with Alphabet, each of the Individual Defendants had access to adverse, non-public information about the Company.

88.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Alphabet.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

89.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

90.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, and violations of Sections 14(a), 10(b), and 20(a) of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects and internal controls; and (iii) artificially inflate the Company's stock price while the Company repurchased its own stock.

91.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Alphabet was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

92.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

93.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Alphabet, and was at all times acting within the course and scope of such agency.

## ALPHABET'S CODE OF CONDUCT

94.     The Company's Code of Conduct (the "Code of Conduct") states that "[e]mployees of Alphabet and its subsidiaries and controlled affiliates ('Alphabet') should do the right thing – follow the law, act honorably, and treat co-workers with courtesy and respect."

95.     The Code of Conduct further states that "[w]e expect all of our employees and Board members to know and follow this Code of Conduct."

96.     The Code of Conduct notes that "waivers of this Code for directors or executive officers must be approved by our Board."

97.     The Code of Conduct provides, regarding "Financial Integrity and Responsibility," in relevant part, that persons subject to the Code of Conduct must "[e]nsure that money is appropriately spent, our financial records are complete and accurate, and our internal controls are honored."

98.     Regarding legal compliance, the Code of Conduct provides that those subject to the Code of Conduct must "[c]omply with all applicable legal requirements and understand the major laws and regulations that apply to your work."

99.     Regarding "Competition Laws," the Code of Conduct provides, in relevant part:

Be sure you follow all laws designed to promote free and fair competition and protect consumers. ***These laws generally prohibit*** 1) arrangements with competitors that restrain trade, 2) abuse of market power to unfairly disadvantage  competitors, and 3) ***misleading or harming consumers***. Some of these laws carry civil and criminal penalties for individuals and companies.

(Emphasis added.)

100.    Regarding Insider Trading laws, the Code of Conduct provides the following:

***Do not use non-public information to buy or sell stock***, or to pass it along to others so that they may do so. ***That could constitute the crime of insider trading***.

Familiarize yourself with Alphabet's Insider Trading Policy. It describes policies that address the risks of insider trading, such as:

• a prohibition on hedging Alphabet stock

• periodic blackout windows when you may not trade Alphabet stock

 (Emphasis added.)

101.    The Code of Conduct enjoins the Company's employees and directors to "Report Concerns," stating, in relevant part:

To notify Alphabet's Audit Committee of any concerns regarding Alphabet's accounting, internal controls, auditing or conflict minerals matters, you may mail your concern to:

Alphabet Inc.
Attn: Accounting Concerns
1600 Amphitheatre Parkway
Mountain View, CA 94043

102.    In violation of the Code of Conduct, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, and violations of Sections 14(a), 10(b), and 20(a) of the Exchange Act. Four of the Individual Defendants violated the code by selling shares of Company stock during the Relevant Period while in possession of material, non-public information about the Company. Moreover, in violation of the Code of Conduct, the Individual Defendants failed to maintain the accuracy of Company records and reports, comply with laws and

regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct.

## ALPHABET'S AUDIT COMMITTEE CHARTER

103.     The Company's has adopted a Charter for its Audit Committee. That charter provides that the purpose of the Audit Committee is to, among other things:

- **Oversee Alphabet's accounting and financial reporting processes, including Alphabet's disclosure controls and procedures and system of internal controls** and audits of Alphabet's consolidated financial statements.

                                        * * *

- Provide oversight regarding significant financial matters, including Alphabet's tax planning, treasury policies, currency exposures, dividends and share issuance and repurchases.

104.     Regarding the Audit Committee's responsibilities, the Audit Committee Charter provides, in relevant part:

> **The Audit Committee's main responsibility is to oversee Alphabet's financial reporting process (including Alphabet's disclosure controls and procedures and system of internal controls)**. The Audit Committee believes that Alphabet's policies and procedures should remain flexible in order to best react to changing conditions and circumstances. The following list includes the Audit Committee's main recurring processes in carrying out its responsibilities. This list is intended as a guide, with the understanding that the Audit Committee can supplement it as appropriate, consistent with the requirements of the SEC and the NASDAQ.

                                        * * *

> 5.  Internal Controls; Risk Assessment. **The Audit Committee will discuss with management and the independent auditors the design, implementation, adequacy and effectiveness of Alphabet's internal controls**. The Audit Committee will also meet separately with the independent auditors, with and without management present, to discuss the results of their examinations. **The Audit Committee will provide oversight over the system of internal controls, relying upon management's and the independent auditors' representations and assessments of, and recommendations regarding, these controls. The Audit Committee will review any required disclosures regarding Alphabet's internal controls**.

> The Audit Committee has responsibility for oversight of risks and exposures associated with financial matters, particularly financial reporting, tax, accounting, disclosure, internal control over financial reporting, investment guidelines and credit and liquidity

matters, our programs and policies relating to legal compliance and strategy, and our operational infrastructure, particularly reliability, business continuity, capacity, security, and data privacy, including cybersecurity. The Audit Committee shall provide regular reports to the full Board of Directors. In order to facilitate this review, the Audit Committee shall meet in executive session with key management personnel and representatives of outside advisors as required.

(Emphasis added.)

105.    The Audit Committee Charter provides that the Audit Committee's responsibilities also include:

11. CEO and CFO Certifications. The Audit Committee will review the CEO and CFO disclosure and certifications under Sections 302 and 906 of the Sarbanes-Oxley Act.

12. Related Party Transactions. The Audit Committee will review and approve all related party transactions.

## **INDIVIDUAL DEFENDANTS' MISCONDUCT**

### **Background**

106.    Incorporated in 2015, Alphabet is the parent company of its leading subsidiary, Google. Google was incorporated in 1998.

107.    Google provides numerous services, including a search engine, email service, its "G Suite" of productivity products, and a social networking platform, Google+.

108.    Google has struggled to properly handle users' data privacy. Google agreed to a proposed settlement in March 2011, containing a consent decree, in connection with Google Buzz, a Google social networking product. The FTC found that Google used deceptive tactics and violated its own privacy promises to consumers when it launched Google Buzz in 2010. The settlement prevented Google from misrepresenting the privacy of users' information or user's control over the collection, use, or disclosure of covered information, and required Google to establish a "comprehensive privacy program" designed to address privacy risks related to the its products and services, and "protect the privacy and confidentiality of covered information."

109.    Google paid $22.5 million in 2012 to settle charges it violated the 2011 decree as a result of bypassing the privacy settings of customers using the Safari browser.

110.    Google created an application programming interface ("API")[12] as part of Google+ to allow application developers to access the profile information of users who a had permitted sharing of such information though their privacy settings. Such information included users' personal and contact information, and information about other users to whom those users were connected on the network.

111.    A bug in this API allowed outside developers to access personal information of Google+ users who had opted against disclosing such data in their privacy settings. This bug was present between 2015 and March 2018.

112.    On February 6, 2018, the Company filed with the SEC its report for the fiscal year and quarter ended December 31, 2017 on Form 10-K (the "2017 10-K"). Regarding the "Risk Factors" facing the Company, the 2017 10-K stated, in relevant part:

> ***Privacy concerns relating to our technology could damage our reputation and deter current and potential users or customers from using our products and services. If our security measures are breached resulting in the improper use and disclosure of user data, or if our services are subject to attacks that degrade or deny the ability of users to access our products and services, our products and services may be perceived as not being secure, users and customers may curtail or stop using our products and services, and we may incur significant legal and financial exposure.***
>
> From time to time, concerns have been expressed about whether our products, services, or processes compromise the privacy of users, customers, and others. Concerns about our practices with regard to the collection, use, disclosure, or security of personal information or other privacy related matters, even if unfounded, could damage our reputation and adversely affect our operating results.
>
> Our products and services involve the storage and transmission of users' and customers' proprietary information, and theft and security breaches expose us to a risk of loss of this information, improper use and disclosure of such information, litigation, and potential liability. Any systems failure or compromise of our security that results in the release of our users' data, or in our or our users' ability to access such data, could seriously harm our reputation and brand and, therefore, our business, and impair our ability to attract and retain users. We expect to continue to expend significant resources to maintain state-of-the-art security protections that shield against theft and security breaches.
>
> We experience cyber attacks of varying degrees on a regular basis. Our security measures

---

[12] An API is a software intermediary allowing two applications to communicate with one another.

may also be breached due to employee error, malfeasance, system errors or vulnerabilities, including vulnerabilities of our vendors, suppliers, their products, or otherwise. Such breach or unauthorized access, increased government surveillance, or attempts by outside parties to fraudulently induce employees, users, or customers to disclose sensitive information in order to gain access to our data or our users' or customers' data could result in significant legal and financial exposure, damage to our reputation, and a loss of confidence in the security of our products and services that could potentially have an adverse effect on our business. . . . If an actual or perceived breach of our security occurs, the market perception of the effectiveness of our security measures could be harmed and we could lose users and customers.

113.    The data made available as a result of the Data Breach is highly valuable on the black market, particularly to identity thieves who can use the names, email addresses, birthdates, occupations, genders, nicknames, and other personal information to gain access to countless existing websites and accounts.

114.    Such personal information can be used against the people it belongs to by way of blackmail, embarrassment, or harassment, in addition to fraudulent activity such as obtaining driver's licenses or other identification cards, obtaining government benefits, and obtaining tax returns and refunds.

115.    In April 2007, the President's Identity Task Force published an article through the Federal Trade Commission titled, "Combating Identity Theft – A Strategic Plan," which discussed the harms people potentially face from identity theft, stating, in relevant part:

In addition to the losses that result when identity thieves fraudulently open accounts or misuse existing accounts, monetary costs of identity theft include indirect costs to businesses for fraud prevention and mitigation of the harm once it has occurred (e.g., for mailing notices to consumers and upgrading systems). Similarly, individual victims often suffer indirect financial costs, including the costs incurred in both civil litigation initiated by creditors and in overcoming the many obstacles they face in obtaining or retaining credit. Victims of non-financial identity theft, for example, health-related or criminal record fraud, face other types of harm and frustration.

In addition to out-of-pocket expenses that can reach thousands of dollars for the victims of new account identity theft, and the emotional toll identity theft can take, some victims have to spend what can be a considerable amount of time to repair the damage caused by the identity thieves. Victims of new account identity theft, for example, must correct fraudulent information in their credit reports and monitor their reports for future inaccuracies, close existing bank accounts and open new ones, and dispute charges with individual creditors.

116.    In the 2013 Norton Report, published by Norton, an antivirus & cybersecurity software company, and drawing from one of the largest consumer cybercrime studies ever conducted, the global price tag of cybercrime was estimated at around $113 billion at the time, with victims facing an average cost of $298.

117.    Identity theft issues are made worse by the fact that identity thieves may wait years before using the personal information they are in possession of.  As such, victims of the Data Breach will have to wary of their data being used for unauthorized reasons for years and potentially decades.

118.    The personal information obtained through the Data Breach is commonly sold on the "dark web," a heavily encrypted section of the internet that hinders authorities' ability to find the location or owners of a website, and is accessible through a special browser that seeks to conceal users' identities and online activities.  Once personal information is purchased, it can be used to gain access to bank accounts, social media, and credit card information.  Other sensitive information can be drawn after accessing different accounts, including information drawn from accounts belonging to family, colleagues, and friends of the person whose account was initially breached.

119.    Google's Terms of Service, found at https://policies.google.com/terms, note that information is collected by Google from its users.  Google's Privacy Policy, effective as of May 25, 2018 and still in effect as of the date of filing of this Complaint, states prominently: "When you use our services, you're trusting us with your information.  We understand this is a big responsibility and work hard to protect your information and put you in control."    The Privacy Policy also notes, "We'll share personal information outside of Google when we have your consent."  Moreover, the policy states that users "have choices regarding the information we collect and how it's used," that Google will "ask for your consent before using your information for a purpose that isn't covered in this Privacy Policy," and that Google will "ask for your explicit consent to share any sensitive personal information."  Google also states that users "[c]ontrol whom you share information with through your account on Google+."

Verified Shareholder Derivative Complaint

**The Data Breach**

120.    Purportedly in March 2018, the Company discovered the bug in the Google+ API. The Company then conducted a review of the two weeks of available data, determining the Data Breach included the data of 496,951 Google+ users who had shared private profile data with a friend that could have been accessed by as many as 438 third-party applications.

121.    The Company announced October 8, 2018 that it would permanently shut down the consumer functionality of Google+, and disclosed that the Data Breach was caused by a "software glitch" which allowed outside application vendors to access private Google+ profile data from at least 2015 to March 2018.

122.    In breach of their fiduciary duties, the Individual Defendants knowingly or recklessly permitted or failed to prevent the Data Breach, despite that the user information compromised in the breach was—according to Google—purportedly protected and only shared with express permissions.  As a result of the Data Breach, the Individual Defendants exposed user data to third parties without authorization, indicating that the Company had lax or non-existent data and security policies and protocols, and that the Company's security systems were ultimately inadequate to protect user data.

123.    Users of Google+ can permit third party applications to access their private profile data. The bug in the API permitted third party apps to access personal profile data of other Google+ users within the authorized user's Google+ circles, or designated groups.  The method of access was as follows:

- User A signs up for Google+ and provides personal information including name, date of birth, employer, gender, etc.

- User A goes into Google+'s privacy setting to make his or her profile data viewable to just a specific circle or certain friends on Google+, including User B.

- User B signs up for a third-party application that asks User B to log in using his or her Google+ credentials, and User B gives the application permission to access his or her profile information.

- The developer of the application collects User B's data, but as a result of the bug, the developer also is able to collect the private profile data of User A.

124.    The Individual Defendants knowingly or recklessly allowed this vulnerability to persist since at least 2015, fearing public repercussions had it been disclosed.  Concomitantly, private data belonging to Google+ users was being leaked to unauthorized third parties.

125.    Google's API logs only keep historical data for 2 weeks, so it is not clear precisely how many users had their information compromised during the years the Data Breach was occurring.  The report of nearly 500,000 users being affected only reflects what was determined for a two-week period prior to the discovery of the Data Breach purportedly in March 2018.  Since the Data Breach occurred since at least 2015, the total users compromised can be expected to be significantly larger.

126.    In response to the bug's discovery, a memorandum was drafted by the Company's legal and policy staff and shared with the Company's senior executives. The memo asserted that disclosing the Data Breach would trigger "immediate regulatory interest" and bring Google "into the spotlight alongside or even instead of Facebook" following the Cambridge Analytica scandal. Further, the memo asserted that disclosing the bug "almost guarantees [Defendant Pichai] will testify before Congress."

127.    The Wall Street Journal later reported that after an internal committee decided that the Data Breach should not be disclosed, Defendant Pichai was briefed on the plan.

128.    In breach of their fiduciary duties, the Individual Defendants knowingly or recklessly permitted or failed to prevent the Data Breach.  In further breach of their fiduciary duties, they made the following false and misleading statements concerning, *inter alia*, the Data Breach itself.

**False and Misleading Statements**

*2018 Q1 10-Q*

129.    On April 13, 2018 the Company filed with the SEC its report for the fiscal quarter ended March 31, 2018 on Form 10-Q (the "2018 Q1 10-Q"), which was signed by Defendant Porat.

130.    Regarding "Risk Factors," the 2018 Q1 10-Q stated, in relevant part:

Our operations and financial results are subject to various risks and uncertainties, including those described in Part I, Item 1A, "Risk Factors" in our Annual Report on Form 10-K for the year ended December 31, 2017, which could adversely affect our business, financial condition, results of operations, cash flows, and the trading price of our common and capital stock. There have been no material changes to our risk factors since our Annual Report on Form 10-K for the year ended December 31, 2017.

131. Regarding the Company's internal controls, the 2018 Q1 10-Q stated, in relevant part:

Our management, with the participation of our chief executive officer and chief financial officer, evaluated the effectiveness of our disclosure controls and procedures pursuant to Rule 13a-15 under the Exchange Act, as of the end of the period covered by this Quarterly Report on Form 10-Q.

Based on this evaluation, *our chief executive officer and chief financial officer concluded that, as of March 31, 2018, our disclosure controls and procedures are designed at a reasonable assurance level and are effective* to provide reasonable assurance that information we are required to disclose in reports that we file or submit under the Exchange Act is recorded, processed, summarized, and reported within the time periods specified in the SEC's rules and forms, and that such information is accumulated and communicated to our management, including our chief executive officer and chief financial officer, as appropriate, to allow timely decisions regarding required disclosure.

(Emphasis added.)

132. Attached to the 2018 Q1 10-Q were certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Page and Porat, attesting to the accuracy of the 2018 Q1 10-Q.

***2018 Proxy Statement***

133. The Company filed its 2018 Proxy Statement with the SEC on April 27, 2018. Defendants Page, Brin, Schmidt, Doerr, Ferguson, Greene, Hennessy, Mather, Mulally, Pichai, and Shriram solicited the 2018 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[13]

---

[13] Plaintiff's allegations with respect to the misleading statements in the 2018 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

134.    Regarding the "Board's Role in Risk Oversight," the 2018 Proxy Statement stated, in relevant part:

> ***The Board of Directors has responsibility for risk oversight, with regular reviews of certain areas being conducted by the relevant committees of the Board of Directors, and, when appropriate, by the full Board of Directors.*** Risk topics covered by the relevant Board committees are shared with the full Board of Directors. The oversight responsibility of the Board of Directors and its committees is enabled by management reporting processes, including an annual company-wide risk assessment, that are designed to provide visibility to the Board of Directors and its committees about the identification, assessment, and management of critical risks and management's risk mitigation strategies. ***These areas of focus include strategic, operational,*** financial and reporting, succession and compensation, compliance, ***and other risks, such as privacy and cybersecurity***. The Board of Directors and its committees oversee risks associated with their respective areas of responsibility, as summarized on page 29 of this proxy statement. Each committee meets in executive session with key management personnel and representatives of outside advisors as required.

(Emphasis added.)

135.    The 2018 Proxy Statement then provided a table outlining the risk oversight roles of the various Board committees, stating, in relevant part:

| Board/Committee | Primary Areas of Risk Oversight |
| --- | --- |
| Full Board | Strategic, financial, and ***execution risks and exposures associated with our business strategy***, product innovation, and sales roadmap, policy matters, significant litigation and regulatory exposures, ***and other current matters that may present material risk to our financial performance, operations***, infrastructure, plans, prospects ***or reputation***, acquisitions and divestitures. |
| Audit Committee | ***Risks and exposures associated with*** financial matters, particularly financial reporting, tax, accounting, disclosure, internal control over financial reporting, investment guidelines and credit and liquidity matters, our programs and policies relating to legal compliance and strategy, merger and acquisition activities, and ***our operational infrastructure, particularly*** reliability, business |

> continuity, capacity, security, and ***data privacy, including cybersecurity***.

(Bold headings in original. Bold & italic emphasis added.)

136.    The 2018 Proxy Statement stated, regarding its Code of Conduct that:

> ***We have adopted a code of business conduct and ethics for directors, officers (including our principal executive officer, principal financial officer, and principal accounting officer), and employees, known as the Alphabet Code of Conduct***. We have also adopted Corporate Governance Guidelines, which, in conjunction with our certificate of incorporation, bylaws, and charters of the standing committees of our Board of Directors, form the framework for our corporate governance. The Alphabet Code of Conduct and our Corporate Governance Guidelines are available on the Investor Relations section of our website at https://abc.xyz/investor/. We will post amendments to the Alphabet Code of Conduct or any waivers of the Alphabet Code of Conduct for directors and executive officers on the same website.

(Emphasis added.)

137.    The 2018 Proxy Statement was false and misleading because, despite assertions to the contrary, its Code of Conduct was not followed, as evidenced by the numerous false and misleading statements alleged herein and the insider trading engaged in by four of the Individual Defendants.

138.    The Individual Defendants also caused the 2018 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to employ "pay-for-performance" elements, including an "equity awards to align employee and stockholder interests" while failing to disclose that the Company's share price was artificially inflated as a result of false and misleading statements alleged herein and the repurchases of Company stock.

139.    The 2018 Proxy Statement also failed to disclose that: (1) a software issue caused the Company to expose the private data of no less than 496,951 users of the Company's Google+ social network; (2) the Company, with the knowledge of at least one of the Individual Defendants, concealed this data breach for months; (3) the foregoing constituted a violation of the Company's security and data privacy policies, and may have constituted a violation of one or more consent decrees; (4) upon the disclosure of the foregoing, the Company would be subject to reputational damage and increased regulatory scrutiny; (5) the Company's security systems were inadequate to protect user data; (6) the

Company's management failed to set an appropriate "tone at the top"; (7) the Company failed to maintain internal controls; and (8) due to the foregoing, Defendants' statements regarding the Company's business, operations, and prospects were materially false, misleading, and lacked a reasonable basis in fact at all relevant times.

### *Privacy Policy*

140.    Google has adopted and published a privacy policy, the most recent version of which was effective as of May 25, 2018 (the "Privacy Policy"). The Privacy Policy provides, regarding users' sharing of personal information:

> **When you share your information**
>
> ***Many of our services let you share information with other people, and you have control over how you share***. For example, you can share videos on YouTube publicly or you can decide to keep your videos private. Remember, when you share information publicly, your content may become accessible through search engines, including Google Search.

(Bold heading in original, bold & italic emphasis added.)

141.    The Privacy Policy provides, regarding Google's sharing of users' personal information, that:

> ***We do not share your personal information with companies, organizations, or individuals outside of Google except in the following cases***:
>
> With your consent
>
> We'll share personal information outside of Google when we have your consent. For example, if you use Google Home to request a ride from a ride-sharing service, we'll get your permission before sharing your address with that service. ***We'll ask for your explicit consent to share any sensitive personal information.***
>
> With domain administrators
>
> * * *
>
> For external processing
>
> * * *
>
> For legal reasons

(Emphasis added.)

142.    The Privacy Policy further asserts that Google protects users' information by building

security into the Company's services. The Privacy Policy states, in relevant part:

**We build security into our services to protect your information**

*All Google products are built with strong security features that continuously protect your information*. The insights we gain from maintaining our services help us detect and automatically block security threats from ever reaching you. And *if we do detect something risky that we think you should know about, we'll notify you and help guide you through steps to stay better protected.*

*We work hard to protect you and Google from unauthorized access, alteration, disclosure, or destruction of information we hold*, including:

- We use encryption to keep your data private while in transit

- We offer a range of security features, like Safe Browsing, Security Checkup, and 2 Step Verification to help you protect your account

- *We review our information collection, storage, and processing practices, including physical security measures, to prevent unauthorized access to our systems*

- *We restrict access to personal information to Google employees, contractors, and agents who need that information in order to process it*. Anyone with this access is subject to strict contractual confidentiality obligations and may be disciplined or terminated if they fail to meet these obligations.

(Bold heading in original, bold & italic emphasis added.)

*2018 Q2 10-Q*

143.    On July 24, 2018 the Company filed with the SEC its report for the fiscal quarter ended

June 30, 2018 on Form 10-Q (the "2018 Q2 10-Q"), which was signed by Defendant Porat.

144.    Regarding "Risk Factors," the 2018 Q2 10-Q stated, in relevant part:

Our operations and financial results are subject to various risks and uncertainties, including those described in Part I, Item 1A, "Risk Factors" in our Annual Report on Form 10-K for the year ended December 31, 2017, which could adversely affect our business, financial condition, results of operations, cash flows, and the trading price of our common and capital stock. There have been no material changes to our risk factors since our Annual Report on Form 10-K for the year ended December 31, 2017.

(Emphasis added.)

145.    Regarding the Company's internal controls and procedures, the 2018 Q2 10-Q stated, in relevant part:

> *Our management, with the participation of our chief executive officer and chief financial officer, evaluated the effectiveness of our disclosure controls and procedures* pursuant to Rule 13a-15 under the Exchange Act, as of the end of the period covered by this Quarterly Report on Form 10-Q.
>
> Based on this evaluation, our *chief executive officer and chief financial officer concluded that, as of June 30, 2018, our disclosure controls and procedures are designed at a reasonable assurance level and are effective* to provide reasonable assurance that information we are required to disclose in reports that we file or submit under the Exchange Act is recorded, processed, summarized, and reported within the time periods specified in the SEC's rules and forms, and that such information is accumulated and communicated to our management, including our chief executive officer and chief financial officer, as appropriate, to allow timely decisions regarding required disclosure.

(Emphasis added.)

146.    Attached to the 2018 Q2 10-Q were SOX certifications signed by Defendants Page and Porat, attesting to the accuracy of the 2018 Q2 10-Q.

147.    The statements in ¶¶ 129-132 and 140-146 were materially false and misleading, and they failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants improperly failed to disclose that: (1) a software issue caused the Company to expose the private data of no less than 496,951 users of the Company's Google+ social network; (2) the Company, with the knowledge of at least one of the Individual Defendants, concealed this data breach for months; (3) the foregoing constituted a violation of the Company's security and data privacy policies, and may have constituted a violation of one or more consent decrees; (4) upon the disclosure of the foregoing, the Company would be subject to reputational damage and increased regulatory scrutiny; (5) the Company's security systems were inadequate to protect user data; (6) the Company's management failed to set an appropriate "tone at the top"; (7) the Company failed to maintain internal controls; and (8) due to the foregoing, Defendants' statements regarding the Company's business, operations, and prospects were materially false, misleading, and lacked a reasonable basis in fact at all relevant times.

**The Truth Begins to Emerge**

148.    The Wall Street Journal published an article on October 8, 2018 revealing that the private

data of hundreds of thousands of Google+ users had been exposed, titled "Google Exposed User Data,

Feared Repercussions of Disclosing to Public."

149.    The article began by discussing the breach and Google's response thereto:

> ***Google exposed the private data of hundreds of thousands of users of the Google+ social network and then opted not to disclose the issue this past spring, in part because of fears that doing so would draw regulatory scrutiny and cause reputational damage***, according to people briefed on the incident and documents reviewed by The Wall Street Journal.

> ***As part of its response to the incident, the Alphabet Inc. [] unit on Monday announced a sweeping set of data privacy measures that include permanently shutting down all consumer functionality of Google+.*** The move effectively puts the final nail in the coffin of a product that was launched in 2011 to challenge Facebook Inc. [] and is widely seen as one of Google's biggest failures.

> ***A software glitch in the social site gave outside developers potential access to private Google+ profile data between 2015 and March 2018, when internal investigators discovered and fixed the issue,*** according to the documents and people briefed on the incident. ***A memo reviewed by the Journal prepared by Google's legal and policy staff and shared with senior executives warned that disclosing the incident would likely trigger "immediate regulatory interest" and invite comparisons to Facebook's leak of user information to data firm Cambridge Analytica.***

> ***Chief Executive Sundar Pichai was briefed on the plan not to notify users after an internal committee had reached that decision, the people said.***

(Emphasis added.)

150.    The article continued, stating:

> The closure of Google+ is part of a broader review of privacy practices by Google that has determined the company needs tighter controls on several major products, the people said. In its announcement Monday, the company said it is curtailing the access it gives outside developers to user data on Android smartphones and Gmail.

> ***The episode involving Google+, which hasn't been previously reported, shows the company's concerted efforts to avoid public scrutiny of how it handles user information, particularly at a time when regulators and consumer privacy groups are leading a charge to hold tech giants accountable for the vast power they wield over the personal data of billions of people.***

> The snafu threatens to give Google a black eye on privacy after public assurances that it was less susceptible to data gaffes like those that have befallen Facebook. It may also complicate Google's attempts to stave off unfavorable regulation in Washington. Mr. Pichai recently agreed to testify before Congress in the coming weeks.

> "Whenever user data may have been affected, we go beyond our legal requirements and

40

apply several criteria focused on our users in determining whether to provide notice," a Google spokesman said in a statement.

In weighing whether to disclose the incident, the company considered "whether we could accurately identify the users to inform, whether there was any evidence of misuse, and whether there were any actions a developer or user could take in response," he said. "None of these thresholds were met here."

151.     Regarding the Company's discovery of the data breach, the article stated, in relevant part:

***In March of this year, Google discovered that Google+ also permitted developers to retrieve the data of some users who never intended to share it publicly, according to the memo and two people briefed on the matter. Because of a bug in the API, developers could collect the profile data of their users' friends even if that data was explicitly marked nonpublic in Google's privacy settings, the people said.***

***During a two-week period in late March, Google ran tests to determine the impact of the bug, one of the people said. It found 496,951 users who had shared private profile data with a friend could have had that data accessed by an outside developer, the person said.*** Some of the individuals whose data was exposed to potential misuse included paying users of G Suite, a set of productivity tools including Google Docs and Drive, the person said. G Suite customers include businesses, schools and governments.

Because the company kept a limited set of activity logs, it was unable to determine which users were affected and what types of data may potentially have been improperly collected, the two people briefed on the matter said. ***The bug existed since 2015, and it is unclear whether a larger number of users may have been affected over that time.***

Google believes up to 438 applications had access to the unauthorized Google+ data, the people said. Strobe investigators, after testing some of the apps and checking to see if any of the developers had previous complaints against them, determined none of the developers looked suspicious, the people said. ***The company's ability to determine what was done with the data was limited because the company doesn't have "audit rights" over its developers, the memo said. The company didn't call or visit with any of the developers, the people said.***

(Emphasis added.)

152.     Regarding the Company's disclosure of the breach, the article stated, in relevant part:

The question of whether to notify users went before Google's Privacy and Data Protection Office, a council of top product executives who oversee key decisions relating to privacy, the people said.

Internal lawyers advised that Google wasn't legally required to disclose the incident to the public, the people said. Because the company didn't know what developers may have what data, the group also didn't believe notifying users would give any actionable benefit to the end users, the people said.

The memo from legal and policy staff wasn't a factor in the decision, said a person familiar with the process, but reflected internal disagreements over how to handle the matter.

***The document shows Google officials felt that disclosure could have serious ramifications***. Revealing the incident would likely result "in us coming into the spotlight

alongside or even instead of Facebook despite having stayed under the radar throughout the Cambridge Analytica scandal," the memo said. It "almost guarantees Sundar will testify before Congress."

(Emphasis added.)

153.    The data breach was reported by numerous other news outlets on October 8, 2018, including Fox News, Business Insider, CBS News, The New York Times, and The New York Post.

154.    Also on October 8, 2018, Alphabet issued a blog post announcing that it would be shutting down Google+ by the end of August 2019. Regarding the data breach, the blog post stated, in relevant part:

> [W]e discovered a bug in one of the Google+ People APIs:
>
>             * * *
>
> - The bug meant that apps also had access to Profile fields that were shared with the user, but not marked as public.
>
> - This data is limited to static, optional Google+ Profile fields including name, email address, occupation, gender and age. (See the full list on our developer site.) It **does not** include **any other data** you may have posted or connected to Google+ or any other service, like Google+ posts, messages, Google account data, phone numbers or G Suite content.
>
> - ***We discovered and immediately patched this bug in March 2018***. We believe it occurred after launch as a result of the API's interaction with a subsequent Google+ code change.
>
> - We made Google+ with privacy in mind and therefore keep this API's log data for only two weeks. That means ***we cannot confirm which users were impacted by this bug. However, we ran a detailed analysis over the two weeks prior to patching the bug, and from that analysis, the Profiles of up to 500,000 Google+ accounts were potentially affected***. Our analysis showed that up to 438 applications may have used this API. . . .

(Bold emphasis in original, bold & italic emphasis added.)

155.    On this news, the price per share of Alphabet's Class A stock declined over two trading days from a close of $1,167.83 per share on October 5, 2018 to close at $1,145.17 per share on October 9, 2018 -- a drop of 1.9%, or $22.66. The price per share of Alphabet's Class C stock declined over two

trading days from a close of $1,157.35 per share on October 5, 2018 to close at $1,138.82 per share on October 9, 2018 -- a drop of 1.6%, or $18.53.

156.    On or about October 9, 2018, the Data Protection Commissioner of Ireland announced that an information request to Google to establish the facts surrounding the data breach and determine if any further action is required.

157.    On October 10, 2018, the Google+ data breach was addressed by several members of the U.S. Senate. During a congressional hearing, Senator Richard Blumenthal announced that he would be calling on the FTC to investigate the Company as a result of the data breach. Senator Blumenthal, joined by Senators Tom Udall and Ed Markey, sent a letter to the FTC that day, enjoining the agency to conduct an investigation into "whether the Google+ incident constitutes a breach of the company's consent decree or other commitments, and more broadly whether Google has engaged in deceptive acts and practices with respect to privacy." The letter highlighted that Google was under a consent decree in connection with a settlement arising from the operation of another social media platform, Google Buzz, stating, in relevant part:

> The FTC has already put Google on notice, twice. In March 2011, ***Google agreed to a proposed settlement containing a consent decree after the FTC found that the company used deceptive tactics and violated its own privacy promises to consumers when it launched its first social network product, Google Buzz, in 2010. Under the settlement, Google was barred from misrepresenting the privacy of personal information or the extent to which consumers may exercise control over the collection, use, or disclosure of covered information. The FTC also required Google to establish a "comprehensive privacy program*** that is reasonably designed to: (1) address privacy risks related to the development and management of new and existing products and services for consumers, and (2) protect the privacy and confidentiality of covered information." Included in this program was the "regular testing or monitoring of the effectiveness of those privacy controls and procedures," which would be audited by an independent third-party professional. Google is one of the rare companies that has violated a[n] FTC consent decree, leading to a record fine for its circumvention of privacy protections in the web browser Safari.

(Emphasis added, footnotes omitted.)

158.    On this news, the price per share of Alphabet's Class A stock fell, closing at $1,092.16 per share on October 10, 2018 -- a drop of 4.6%, or $53.01, from their closing price on October 9, 2018. The

price per share of Alphabet's Class C stock also fell, closing at $1,081.22 per share on October 10, 2018 -- a drop of 5%, or $57.60, from their closing price on October 9, 2018.

159.    On October 11, 2018, Senators John Thune, Jerry Moran and Roger Wicker sent a letter to Google seeking and explanation for the Company's delay in reporting the data breach. The letter sought disclosure of the internal memo referenced by The Wall Street Journal that had recommended against disclosing the data breach. The letter further asked if the Google+ vulnerability had been disclosed to any federal agencies, and queried wither there were "similar incidents which have not been publicly disclosed?"

160.    On October 24, 2018 Senators Amy Klobuchar and Catherine Cortez Masto wrote to Defendant Pichai, inquiring about the Company's failure to disclose the data breach for six months, and noting that the data breach raises "serious concerns" regarding the Company's compliance with its 2011 consent decree with the FTC. The letter and its contents were reported by Business Insider on the same day.

161.    On this news, the price per share of Alphabet's Class A stock fell, closing at $1,057.12 per share on October 24, 2018 -- a drop of 5.2%, or $57.79 from their closing price on October 23, 2018. The price per share of Alphabet's Class C stock also fell, closing at $1,050.71 per share on October 24, 2018 -- a drop of 5%, or $52.98, from their closing price on October 23, 2018.

162.    On November 2, 2018, the New York Times reported that Google's top Washington lobbyist, Susan Molinari, would be stepping down.

163.    On December 11, 2018, *Zacks Equity Research* published a report stating that Alphabet's "Google division will now expedite the procedure needed to shut down the consumer version of its social network Google+." Moreover, the report noted that Google had "identified a second significant security breach this year." The report stated, in relevant part:

> **Alphabet Inc.'**s [ ] Google division will now expedite the procedure needed to shut down the consumer version of its social network Google+.

The company now plans to shut its social media service in April, four months ahead of schedule. The reason behind the same is the bitter truth that Google has identified a second significant security breach this year.

This security flaw could have exposed profile information such as names, email addresses, jobs and age, risking the personal information of approximately 52.5 million Google+ users.

* * *

Reportedly, all Google+ APIs will be shut down in 90 days. However, the enterprise version of Google+, aimed at businesses and other organizations, will still remain on focus.

The new breach may put Google in regulatory scrutiny as well as damage its reputation. However, it goes without saying that the lack of a tight data security system has made important information vulnerable to hackers.

## **REPURCHASES DURING THE RELEVANT PERIOD**

164.    During the period in which the Company made false and misleading statements and omissions, the Individual Defendants caused the Company to initiate repurchases of its common stock at artificially inflated prices that substantially damaged the Company. In total, the Company spent an aggregate amount of approximately $4.3 million to repurchase 3,750  shares of its own Class C capital stock from April 2018 through September 2018.

165.    As the Company stock was actually only worth $1,020.08 per share, the price at closing on October 29, 2018, the Company overpaid approximately $426,312 in total for these repurchases.

166.    According to the Company's 2018 Q2 10-Q, in the quarter ended June 30, 2018, the Individual Defendants caused the Company to repurchase 1,908 shares of its own common stock at an average price per share of approximately $1,075.05, for a total cost to the Company of approximately $2.1 million.[14]

---

[14] Upon information and belief, some, if not all, of the 698 Class C shares repurchased in April 2018 were repurchased after the Relevant Period began on April 23, 2018.

Verified Shareholder Derivative Complaint

167.    Due to the artificial inflation of the Company's stock price caused by misrepresentations alleged to have been made by the Individual Defendants, the Company paid on average $54.97 more than the actual worth of each share during the quarter ended June 30, 2018. Thus, the total over payment by the Company for repurchases of its own stock during the quarter ended June 30, 2018 was approximately $104,883.

168.    According to the Company's Form 10-Q filed with the SEC on October 26, 2018, in the quarter ended September 30, 2018, the Individual Defendants caused the Company to repurchase 1,842 shares of its own common stock at an average price per share of approximately $1,194.58, for a total cost to the Company of approximately $2.2 million.

169.    Due to the artificial inflation of the Company's stock price caused by misrepresentations alleged to have been made by the Individual Defendants, the Company paid on average $174.50 more than the actual worth of each share during the quarter ended September 30, 2018. Thus, the total over payment by the Company for repurchases of its own stock during the quarter ended September 30, 2018 was approximately $321,429.

170.    In total, the Company overpaid an aggregate amount of approximately $426,312 for repurchases of its own stock during the period of time in which the Company made false and misleading statements and omissions.

### DAMAGES TO ALPHABET

171.    As a direct and proximate result of the Individual Defendants' conduct, Alphabet has lost and will continue to lose and expend many millions of dollars.

172.    Such expenditures include, but are not limited to, legal fees associated with the Securities Class Actions filed against the Company and its CEO, its CFO, its subsidiary Google's CEO, and any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

173.    Such expenditures include, but are not limited to, legal fees associated with the California Class Action filed against the Company and its subsidiary Google, and any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

174.    Such losses include, but are not limited to, approximately $426,311 that the Company overpaid, at the direction of the Individual Defendants, for its repurchases of its own stock at artificially inflated prices.

175.    Such expenses caused by the Data Breach include, but are not limited to, costs to investigate the Data Breach, provide identity protection services, including credit monitoring, to impacted customers; costs to increase call center staffing; and payments for legal and other professional services and to resolve litigation.

176.    Such expenditures include, but are not limited to, any fines and legal fees that may arise should the Company's conduct be found to violate any consent decree, including, but not limited to, the 2011 consent decree with the FTC.

177.    Additionally, these expenditures include, but are not limited to, handsome compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

178.    As a direct and proximate result of the Individual Defendants' conduct, Alphabet has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties, waste of corporate assets, and unjust enrichment.

## DERIVATIVE ALLEGATIONS

179.    Plaintiff brings this action derivatively and for the benefit of Alphabet to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Alphabet, unjust enrichment, waste of corporate assets, violations of Sections 14(a), 10(b), and 20(a) of the Exchange Act, as well as the aiding and abetting thereof.

180.    Alphabet is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

181.    Plaintiff is, and has been at all relevant times, a shareholder of Alphabet. Plaintiff will adequately and fairly represent the interests of Alphabet in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

182.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

183.    A pre-suit demand on the Board of Alphabet is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following eleven Individual Defendants: Defendants Page, Brin, Schmidt, Pichai, Doerr, Ferguson, Greene, Hennessy, Mather, Mulally, and Shriram. Plaintiff needs only to allege demand futility as to six of the eleven Directors who are on the Board at the time this action is commenced.

184.    Demand is excused as to all of the Directors because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts, while four of them engaged in insider sales based on material non-public information, netting proceeds of approximately $136 million, while, at the same time, they caused the Company to repurchase its own stock at artificially inflated prices, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

185.    In complete abdication of their fiduciary duties, the Directors either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading

statements alleged herein. The fraudulent scheme was intended to make the Company appear more profitable and attractive to investors. As a result of the foregoing, the Directors breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

186. Defendants Page, Brin, Schmidt, Doerr, Hennessy, Mather, Mulally, and Shriram were all on the Board in 2011 when Google entered into a consent decree with the FTC following the FTC's determination that Google had engaged in deceptive tactics and violated privacy promises to consumers in connection with Google Buzz. These Defendants were also on the Board in 2012 when Google was fined for violating the consent decree by circumventing privacy protections in another firm's web browser. Thus, Defendants Page, Brin, Schmidt, Doerr, Hennessy, Mather, Mulally, and Shriram were aware of the importance of privacy protections, especially in the social networking space.

187. Additional reasons that demand on Defendant Page is futile follow. Defendant Page is one of the Company's founders and has served as a Company Director since 1998. He has been Alphabet's CEO since 2015, and was the CEO of Google from 2011 to 2015. Thus, as the Company admits, Defendant Page is a non-independent Director. As a Company founder, long-time director, and CEO of Alphabet, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Page also solicited the 2018 Proxy Statement, which contained material misrepresentations and omissions, as alleged above. Defendant Page is also a defendant in the Securities Class Actions. Thus, for these reasons, Defendant Page breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

188. Additional reasons that demand on Defendant Pichai is futile follow. Defendant Pichai has served as a Company Director since 2017 and has served as Google's CEO since 2015. Thus, as the

Company admits, Defendant Pichai is a non-independent director. He receives handsome compensation, including over $1.3 million in 2017 and over $199.7 million in 2016. His insider transactions before the fraud was exposed, which yielded approximately $110.4 million in proceeds, demonstrate his motive in facilitating and participating in the fraud. As a trusted Company director, and CEO of Google, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Pichai bears personal responsibility for the Company's delay in disclosing the data breach—as reported by The Wall Street Journal, Defendant Pichai was briefed on the Company's decision not to disclose the data breach after the decision was made by a committee. Defendant Pichai also solicited the 2018 Proxy Statement, which contained material misrepresentations and omissions, as alleged above. Defendant Pichai is also a defendant in one of the Securities Class Actions. For these reasons, too, Defendant Pichai breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

189.    Additional reasons that demand on Defendant Brin is futile follow. Defendant Brin is one of the Company's founders, has served as a Company director since 1998, and is the President of Alphabet. Thus, as the Company admits, he is a non-independent director. As a Company founder, long-time director and Alphabet's President, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Brin solicited the 2018 Proxy Statement, which contained material misrepresentations and omissions, as alleged above. Thus, for these reasons, Defendant Brin breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

190.     Additional reasons that demand on Defendant Schmidt is futile follow. Defendant Schmidt has been a Company director since 2001, as Google's CEO from 2001 to 2011, as Alphabet's Executive Chair from 2015 to January 2018, and currently serves as a technical advisor to the Company. Thus, as the Company admits, he is a non-independent director. He receives handsome compensation, including over $4.7 million in 2017 and over $4.3 million in 2016. As a trusted Company director and technical advisor, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Schmidt also solicited the 2018 Proxy Statement, which contained material misrepresentations and omissions, as alleged above. Further, as stated by Defendant Schmidt on January 20, 2011 conference call, Defendants Schmidt, Brin and Page are "best friends" in addition to being longtime colleagues. For these reasons, too, Defendant Schmidt breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

191.     Additional reasons that demand on Defendant Doerr is futile follow. Defendant Doerr has been a Company director since 1999. An early investor, Defendant Doerr has been assisting with the management of Google since at least 1999, when he provided the Company with a collaborative goal-setting process known as Objectives and Key Results. He receives handsome compensation, including $430,567 in 2017. His insider transactions before the fraud was exposed, which yielded approximately $24.5 million in proceeds, demonstrate his motive in facilitating and participating in the fraud. As a long-time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Doerr also solicited the 2018 Proxy Statement, which contained material misrepresentations and omissions, as alleged above. Defendant Doerr has been a General Partner of

Kleiner Perkins since 1980. Between January 1, 2017 and March 31, 2018, Google invested or committed to invest approximately $128.6 million in companies that Kleiner Perkins held a 10% or greater interest in. According to the 2018 Proxy Statement, Defendant Doerr "is a managing director/member of the managing members of those funds," and as a result of these substantial investments, Defendant Doerr is beholden to the Company. Thus, for these reasons, Defendant Doerr breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

192.   Additional reasons that demand on Defendant Hennessy is futile follow. Defendant Hennessy has served as a Company director since 2004, and as Alphabet's Chairman of the Board since January 2018. He receives handsome compensation, including $430,567 in 2017. His insider transactions before the fraud was exposed, which yielded approximately $905,216 in proceeds, demonstrate his motive in facilitating and participating in the fraud. As the Company's Chairman, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Hennessy also solicited the 2018 Proxy Statement, which contained material misrepresentations and omissions, as alleged above. Thus, for these reasons, Defendant Hennessy breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

193.   Additional reasons that demand on Defendant Mather is futile follow. Defendant Mather has been a Company director since 2005, and is Chair of the Audit Committee. She receives handsome compensation, including $455,567 in 2017. Her insider transactions before the fraud was exposed, which yielded approximately $196,965 in proceeds, demonstrate her motive in facilitating and participating in the fraud. As a trusted Company director and Chair of the Audit Committee, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements,

consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Defendant Mather also solicited the 2018 Proxy Statement, which contained material misrepresentations and omissions, as alleged above. For these reasons, too, Defendant Mather breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

194.    Additional reasons that demand on Defendant Greene is futile follow. Defendant Greene has been a Company director since 2012, and as Senior Vice President and CEO of Google Cloud since 2015. Thus, as the Company admits, she is a non-independent director. She receives handsome compensation, including $674,177 in 2017. As a trusted Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Defendant Greene also solicited the 2018 Proxy Statement, which contained material misrepresentations and omissions, as alleged above. For these reasons, too, Defendant Greene breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

195.    Additional reasons that demand on Defendant Ferguson is futile follow. Defendant Ferguson has served as a Company director since 2016, and is a member of the Audit Committee. He receives handsome compensation, including $410,708 in 2017. As a trusted Company director and member of the Audit Committee, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Ferguson also solicited the 2018 Proxy Statement, which contained material misrepresentations and omissions, as alleged above. Thus, for these reasons, Defendant Ferguson

breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

196.    Additional reasons that demand on Defendant Mulally is futile follow. Defendant Mulally has served as a Company director since 2006 and is a member of the Audit Committee. He receives handsome compensation, including $430,567 in 2017. As a long-time Company director and member of the Audit Committee, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Mulally also solicited the 2018 Proxy Statement, which contained material misrepresentations and omissions, as alleged above. Thus, for these reasons, Defendant Mulally breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

197.    Additional reasons that demand on Defendant Shriram is futile follow. Defendant Shriram has served as a Company director since 1998. He receives handsome compensation, including $430,567 in 2017. As a long-time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Shriram also solicited the 2018 Proxy Statement, which contained material misrepresentations and omissions, as alleged above. Defendant Shriram was one of the Company's earliest investors and has assisted the Company since its earliest days, counseling Defendants Brin and Page weekly, assisting them with incorporating Google, and helping to establish a licensing agreement with Stanford University. As a trustee of Stanford University since 2009, which has benefitted from millions of dollars of donations from the Company, Defendant Shriram is unable to evaluate a demand with independence, as granting a demand may jeopardize this continued source of funding for

Stanford University. Thus, for these reasons, Defendant Shriram breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

198.    Additional reasons that demand on the Board is futile follow.

199.    Demand in this case is excused because the Directors, all of whom are named as defendants in this action, and two of whom are defendants in at least one of the Securities Class Actions, control the Company and are beholden to each other. The Directors have longstanding business and personal relationships with each other and the Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. These conflicts of interest precluded the Directors from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, any demand on the Directors would be futile.

200.    For example:

(a)      Defendants Page and Brin met at Stanford University in 1995. They co-founded Google in 1998.

(b)      Defendant Doerr has been a General Partner of Kleiner Perkins Caufield & Byers ("Kleiner Perkins") since 1980. In addition to having served on the Board for nearly 20 years, Defendant Doerr was one of the Company's earliest investors. He met Defendants Page and Brin through his association with Kleiner Perkins, when Defendants Page and Brin were seeking funding for Google. Google has made tens of millions of dollars in investments in private companies in which Kleiner Perkins has invested. In 2007, Google purchased Peakstream, Inc. from $20.3 million, 24.5% of which was received by Kleiner Perkins as part owner of Peakstream, Inc. The Company continues to invest millions in companies in which Kleiner Perkins holds a substantial ownership stake, as alleged above.

(c)     Defendant Hennessy has invested money with Kleiner Perkins, and received 10,556 shares of Google stock after Google's initial public offering as part of an earlier investment that Defendant Hennessy made in a Kleiner Perkins fund.

(d)     Defendant Schmidt held various positions at Sun Microsystems between 1983 and 1997. Kleiner Perkins was an early investor in Sun Microsystems.

(e)     Netscape Communications Corp. ("Netscape") was founded in 1994, with Defendant Shriram as its Vice President. Kleiner Perkins purchased around 25% of Netscape's equity in 1994 for approximately $4 million. In 2006, Defendants Shriram and Doerr traveled to India together to invest in Indian companies and meet entrepreneurs and leaders of the business and political communities.

(f)     Defendant Shriram serves on Stanford University's board of trustees, and Defendant Hennessey is the former President of Stanford University. Since stepping down as Stanford's President, Defendant Hennessey became the inaugural Shriram Family Director of the Knight-Hennessy Scholars Program, a position he still holds. Defendants Page and Brin are both alumni of Stanford University, and the Company has donated millions to Stanford University, including a $2 million pledge in 2006 to Stanford Law School' s Center for Internet and Society. Commentators have suggested that Stanford should not have accepted the donation because it is too narrowly tailor to fit Google's corporate interest in pushing for less-restrictive copyright laws.

Such personal and professional connections prevent Defendants Page, Brin, Doerr, Schmidt, Shriram and Hennessy from evaluating a demand with independence, especially in light of the substantial likelihood of liability faced by Defendant Page in the Securities Class Actions. Therefore, demand is to Defendants Page, Brin, Doerr, Schmidt, Shriram and Hennessy is futile, and, therefore, excused.

201.    Defendants Page, Brin, and Schmidt currently do, and throughout the Relevant Period did, dominate the Company and its Board by virtue of their combined shareholdings of the Company's stock. As of March 29, 2018, these Defendants controlled 56.6% of Alphabet's total shareholder voting power,

as follows: Defendant Page, 25.9%; Defendant Brin, 25.1%; and Defendant Schmidt, 5.6%. In a Form S-1 filed with the SEC on April 29, 2004, it was revealed that Defendants Page, Brin, and Schmidt "operate the company collectively and . . . consult extensively with each other before significant decisions are made." As Defendant Page faces a substantial likelihood of liability in the Securities Class Actions, his ability, along with long-time business associates Defendants Brin and Schmidt, to control all of the decisions of the Company, including the election of directors, prevents the remaining directors, especially Defendants Pichai and Greene--whose primary source of employment is though the Company and its subsidiaries--from evaluating a demand with independence. Therefore, demand is futile as to all of the Directors, and is excused.

202.    Defendants Schmidt, Page, Brin, and Shriram are all parties to transactions with the Company involving aircraft. In 2017, the Company reimbursed Defendant Schmidt over $1.3 million for the use of aircraft owned by Defendant Schmidt by the Company's executive officers for business purposes. Defendants Schmidt, Page, Brin, and Shriram, through their affiliated entities, also use Moffett Airfield, which the Company has leased, for their personal aircraft. The Company charged Defendants Schmidt, Page, Brin, and Shriram approximately $1,720,820 in 2017 for their use of Moffatt Airfield. LTA Research & Exploration LLC, owned by an entity affiliated with Defendant Brin, has also leased a portion of hangar space at Moffett Airfield, at a cost of $423,000 for the period from January 1, 2017 to March 31, 2018. Further, Defendants Page, Brin and Schmidt each own a one-third interest in BCH San Jose LLC ("BCH"). The Company has entered into a license to use a portion of BCH's hangar space to hold its corporate aircraft, and the Company paid BCH $513,971 in 2017. In addition to those reasons named above, as a result of these transactions, demand is futile as to Defendants Schmidt, Page, Brin, and Shriram because they lack independence as a result of these contracts and transactions.

203.    Defendant Page and the wife of Defendant Schmidt are members of the X Prize Foundation Board of Trustees. Alphabet provided the X Prize foundation with a $3.62 million sponsorship in 2017.

Thus, demand is futile as to Defendants Page and Schmidt because they lack independence as a result of this sponsorship, and therefore, demand as to them is excused.

204.    Additionally, each one of the Directors, individually and collectively, faces a substantial likelihood of liability as a result of their intentional or reckless approval of the unnecessary and harmful repurchases that caused the Company to overpay by over $426,311 for its own common stock during the period in which the false and misleading statements were made. The Directors, as alleged herein, were aware or should have been aware of the misinformation being spread by the Company, and yet they approved the repurchases. Thus, the Directors breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

205.    Defendants Mather, Ferguson, and Mulally (the "Audit Committee Defendants") served on the Company's Audit Committee during the Relevant Period. Pursuant to the Audit Committee Charter, the Audit Committee Defendants' main responsibility was to oversee the Company's "financial reporting process (including Alphabet's disclosure controls and procedures and system of internal controls)." Further, as noted in the 2018 Proxy Statement, the Audit Committee is responsible for oversight of the Company's operational infrastructure, including data privacy and cybersecurity. Based on these responsibilities, Audit Committee Defendants permitted and/or caused the Company to issue false and misleading statements as alleged herein, operate with inadequate internal controls, and allowed Google+ users' private data to be leaked. As a result of the Audit Committee's failures of management and oversight, the Audit Committee Defendants face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile.

206.    In violation of the Code of Conduct, the Directors conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, and violations of

Sections 14(a), 10(b), and 20(a) of the Exchange Act. In further violation of the Code of Conduct, four of the Directors engaged in insider sales of Alphabet stock during the Relevant Period, failed to maintain the accuracy of Company records and reports, comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct. Thus, the Directors face a substantial likelihood of liability and demand is futile as to them.

207.   Alphabet has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Alphabet any part of the damages Alphabet suffered and will continue to suffer thereby. Thus, any demand upon the Directors would be futile.

208.   The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Directors can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

209.   The acts complained of herein constitute violations of fiduciary duties owed by Alphabet's officers and directors, and these acts are incapable of ratification.

210.   The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Alphabet. If there is a directors' and officers' liability insurance policy

covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Directors were to sue themselves or certain of the officers of Alphabet, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

211.    If there is no directors' and officers' liability insurance, then the Directors will not cause Alphabet to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

212.    Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, at least six of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

### Against Individual Defendants for Violations of
### Section 14(a) of the Exchange Act

213.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

214.    The Section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. The Section 14(a) claims alleged herein do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these nonfraud claims.

215.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or

of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

216.   Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

217.   Under the direction and watch of the Directors, the 2018 Proxy Statement failed to disclose that: (1) a software issue caused the Company to expose the private data of no less than 496,951 users of the Company's Google+ social network; (2) the Company, with the knowledge of at least one of the Individual Defendants, concealed this data breach for months; (3) the foregoing constituted a violation of the Company's security and data privacy policies, and may have constituted a violation of one or more consent decrees; (4) upon the disclosure of the foregoing, the Company would be subject to reputational damage and increased regulatory scrutiny; (5) the Company's security systems were inadequate to protect user data; (6) the Company's management failed to set an appropriate "tone at the top"; (7) the Company failed to maintain internal controls; and (8) due to the foregoing, Defendants' statements regarding the Company's business, operations, and prospects were materially false, misleading, and lacked a reasonable basis in fact at all relevant times.

218.   The Individual Defendants also caused the 2018 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to employ "pay-for-performance" elements while failing to disclose that the Company's share price was being artificially

inflated by the false and misleading statements made by the Individual Defendants as alleged herein, and therefore any compensation based on the Company's performance was artificially inflated.

219.    The 2018 Proxy Statement also made reference to the Company's Code of Conduct. The Code of Conduct required the Company and Individual Defendants to abide by relevant laws and statutes, make accurate and non-misleading public disclosures, and not engage in insider trading. By issuing false and misleading statements to the investing public and insider trading, the Individual Defendants violated the Code of Conduct. The 2018 Proxy Statement failed to disclose these violations and also failed to disclose that the terms of the Code of Conduct were being violated.

220.    In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2018 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2018 Proxy Statement, including but not limited to, election of directors, ratification of an independent auditor, and the approval of officer compensation.

221.    The false and misleading elements of the 2018 Proxy Statement led to the re-election of Defendants Page, Brin, Schmidt, Doerr, Ferguson, Greene, Hennessy, Mather, Mulally, Shriram, and Pichai. which allowed them to continue breaching their fiduciary duties to Alphabet.

222.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2018 Proxy Statement.

223.    Plaintiff, on behalf of Alphabet, has no adequate remedy at law.

## SECOND CLAIM

### Against Individual Defendants for
### Violations of Section 10(b) and Rule 10b-5 of the Exchange Act

224.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

225.   The Individual Defendants participated in a scheme to defraud with the purpose and effect of defrauding Alphabet. Not only is Alphabet now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, the Company itself is also a victim of the unlawful scheme perpetrated upon Alphabet by the Individual Defendants. With the price of its common stock trading at artificially-inflated prices due to the Individual Defendants' misconduct, the Individual Defendants caused the Company to repurchase millions of dollars of its own shares at artificially-inflated prices, damaging Alphabet.

226.   During the Relevant Period, the Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's public statements made in conference calls, and periodic and current reports filed with the SEC.

227.   The Individual Defendants employed devices, schemes and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Alphabet not misleading.

228.   The Individual Defendants, as top executives and directors of the Company, are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as directors and officers of the Company, the Individual Defendants were able to and did control the conduct complained of herein and the content of the public statements disseminated by Alphabet. The Individual Defendants acted with scienter during the Relevant Period, in that they either had actual knowledge of the schemes and the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were the top executives of the Company, or

received direct briefings from them, and were therefore directly responsible for the schemes set forth herein and for the false and misleading statements and/or omissions disseminated to the public through press releases, conference calls, and filings with the SEC.

229.    In addition to each of the Individual Defendants approving the issuance of the Company's false and misleading statements while they were serving as a senior executive and/or director of the Company, the Individual Defendants made and/or signed the Company's Form 10-Ks and 10-Qs filed with the SEC during the Relevant Period.

230.    By virtue of the foregoing, the Individual Defendants have violated § 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

231.    Plaintiff, on behalf of Alphabet, has no adequate remedy at law.

### THIRD CLAIM

**Against the Individual Defendants for
Violations of Section 20(a) of the Exchange Act**

232.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

233.    The Individual Defendants, by virtue of their positions with Alphabet and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of Alphabet and each of its officers and directors who made the false and misleading statements alleged herein within the meaning of § 20 (a) of the Exchange Act. The Individual Defendants had the power and influence and exercised the same to cause Alphabet to engage in the illegal conduct and practices complained of herein.

234.    Plaintiff, on behalf of Alphabet, has no adequate remedy at law.

## FOURTH CLAIM

### Against the Individual Defendants for Breach of Fiduciary Duties

235.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

236.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Alphabet's business and affairs.

237.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

238.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Alphabet.

239.    In breach of their fiduciary duties, the Individual Defendants knowingly or recklessly permitted or failed to prevent the Data Breach.

240.    In further breach of their fiduciary duties owed to Alphabet, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose that: (1) a software issue caused the Company to expose the private data of no less than 496,951 users of the Company's Google+ social network; (2) the Company, with the knowledge of at least one of the Individual Defendants, concealed this data breach for months; (3) the foregoing constituted a violation of the Company's security and data privacy policies, and may have constituted a violation of one or more consent decrees; (4) upon the disclosure of the foregoing, the Company would be subject to reputational damage and increased regulatory scrutiny; (5) the Company's security systems were inadequate to protect user data; (6) the Company's management failed to set an appropriate "tone at the top"; (7) the Company failed to maintain internal controls; and (8) due to the foregoing, Defendants'

statements regarding the Company's business, operations, and prospects were materially false, misleading, and lacked a reasonable basis in fact at all relevant times.

241.    The Individual Defendants also failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

242.    In breach of their fiduciary duties, four of the Individual Defendants engaged in lucrative insider sales while the price of the Company's common stock was artificially inflated due to the false and misleading statements of material fact discussed herein. Moreover, while the price of the Company's stock was artificially inflated, the Individual Defendants, in further breach of their fiduciary duties, caused the Company to engage in repurchasing approximately $4.3 million worth of Company stock at artificially inflated prices.

243.    Also in breach of their fiduciary duties, the Individual Defendants failed to maintain internal controls.

244.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Alphabet's securities, and disguising insider transactions.

245.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted

with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Alphabet's securities, and engaging in insider transactions. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

246.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

247.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Alphabet has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

248.    Plaintiff on behalf of Alphabet has no adequate remedy at law.

## FIFTH CLAIM

### Against Individual Defendants for Unjust Enrichment

249.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

250.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Alphabet.

251.    The Individual Defendants, based on improper conduct, received bonuses, stock options, or similar compensation from Alphabet that was tied to the performance or artificially inflated valuation of Alphabet, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

252.    Plaintiff, as a shareholder and a representative of Alphabet, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

253.    Plaintiff on behalf of Alphabet has no adequate remedy at law.

## SIXTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

254.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

255.    As a result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

256.    In addition, the Individual Defendants caused the Company to repurchase shares of its own common stock at artificially inflated prices, thereby wasting the Company's assets.

257.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

258.    Plaintiff, on behalf of Alphabet, has no adequate remedy at law.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of Alphabet, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and abetted

the breach of their fiduciary duties to Alphabet;

(c)     Determining and awarding to Alphabet the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)     Directing Alphabet and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Alphabet and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

2. a provision to permit the shareholders of Alphabet to nominate at least six candidates for election to the Board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)     Awarding Alphabet restitution from Individual Defendants, and each of them;

(f)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)     Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: January 18, 2019

Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

By: /s/Laurence M. Rosen
Laurence M. Rosen, Esq. (SBN 219683)
355 S. Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*

Verified Shareholder Derivative Complaint

DocuSign Envelope ID: 032F49C5-6814-4B88-B3E9-587BBA3A5401

<u>VERIFICATION</u>

I, Victor Bao  am the plaintiff in the within action. I have read the foregoing complaint and know the contents thereof. The allegations of the complaint are true of my personal knowledge, except as to the matters therein stated to be alleged on information and belief, and as to those matters I believe them to be true.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this _th day of January 2019.

1/17/2019

DocuSigned by:

392C114BCE77429

Victor Bao